## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DUANE E. ARMSTRONG,
         Petitioner,

v.                                                    Case No. 8:23-cv-1426-KKM-LSG

SECRETARY, DEPARTMENT
OF CORRECTIONS,
         Respondent.
_____

### ORDER

Armstrong, a Florida prisoner, timely[1] filed a pro se Petition for Writ of

Habeas Corpus under 28 U.S.C. § 2254. (Doc. 1.) Upon consideration of the

petition, (*id.*), the response in opposition, (Doc. 6), and Armstrong's reply, (Doc.

7), the petition is denied. Because reasonable jurists would not disagree,

Armstrong is not entitled to a certificate of appealability.

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). Armstrong's judgment and sentence were affirmed on direct appeal on July 15, 2016. (Doc. 6-2, Ex. 16.) The judgment became final 90 days later, on October 13, 2016, upon expiration of the time to petition the Supreme Court of the United States for a writ of certiorari. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 203 days of untolled time, Armstrong moved for postconviction relief on May 5, 2017. (Doc. 6-2, Ex. 18.) Postconviction proceedings remained pending until the state appellate court's mandate issued on March 21, 2023. (Doc. 6-2, Ex. 31.) After 92 days of untolled time, Armstrong filed his 2254 petition on June 22, 2023. Because fewer than 365 days of untolled time elapsed, the petition is timely.

1

I.    **BACKGROUND**

**A. Procedural Background**

A state court jury convicted Armstrong of burglary of a dwelling and theft. (Doc. 6-2, Ex. 8.) The state trial court sentenced him to an overall term of 30 years in prison as a habitual felony offender. (Doc. 6-2, Ex. 11.) The state appellate court per curiam affirmed the convictions and sentence. (Doc. 6-2, Ex. 16.) Armstrong sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 16-2, Ex. 18.) The state trial court denied Armstrong's motion, and the state appellate court per curiam affirmed the denial. (Doc. 16-2, Exs. 19, 23 & 28.)

**B. Factual Background**[2]

On April 17, 2012, Argelio Ferrei came home to find that his family's Tampa home had been ransacked. (Doc. 6-2, Ex. 7, pp. 173-74.) A bathroom window was broken, and the screen had been removed. (*Id.*, pp. 128-30.) When police arrived, a crime scene technician dusted for fingerprints and lifted one latent print from the toilet below the broken window. (*Id.*, pp. 203-07.) Among the items missing from the home were pieces of jewelry that belonged to Argelio Ferrei's wife, Jamie Ferrei. (*Id.*, p. 134.)

---

[2] This summary is based on the trial transcript and appellate briefs.

2

Fingerprint analyst Susan Delage compared the latent print from the Ferreis' bathroom to Armstrong's known print and concluded that the latent print was Armstrong's. (*Id.*, pp. 337-38, 349.) Delage confirmed the match by comparing the latent print to prints of Armstrong's that she had personally taken. (*Id.*, pp. 351-54.)

Police executed a search warrant on an SUV registered to Armstrong. (*Id.*, pp. 227-28, 236-39, 246-48.) Several pieces of jewelry and a wallet with Armstrong's identification were in the glovebox. (*Id.*, pp. 237-39.) One of the pieces of jewelry was a high school class ring with the name Jamie Lee Holland, Jamie Ferrei's maiden name. (*Id.*, pp. 152-54, 251-53.) Jamie Ferrei identified the class ring and other jewelry as hers and stated that they had been missing from her dresser since the burglary. (*Id.*, pp. 135-155, 259-61.)

Armstrong testified at trial that he had never been to the Ferreis' property. (*Id.*, p. 386.)  He stated that he bought the jewelry from two men for $250.00. (*Id.*, pp. 384-87.)

## II.   <u>STANDARD OF REVIEW UNDER SECTION 2254</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of

habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

4

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas court is "not limited by the

particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Sec'y, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.* at 125-26.

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioner's factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous— so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

## III.   STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Armstrong brings claims for ineffective assistance of trial counsel. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's

7

challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.    ANALYSIS

### A. Ground One

Armstrong argues that trial counsel was ineffective for failing to retain an expert to challenge the State's fingerprint evidence. He contends that this evidence was vulnerable to a challenge because analyst Susan Delage did not employ her usual fingerprint comparison method. Armstrong asserts that an expert would have testified that the latent print was not his. He also alleges that counsel assured him that he would obtain an expert.

### 1. Trial Proceedings

Shortly before jury selection, counsel asserted that the State committed a discovery violation by belatedly disclosing information related to Delage's method of comparing the fingerprints. Counsel stated that he had recently received exhibits prepared by Delage. (Doc. 6-2, Ex. 6, p. 6.) He explained that these exhibits were "blowup" images of fingerprints, with labels indicating the areas of the prints, or the points of comparison, that Delage used in her analysis. (*Id.*, pp. 6-8.) But counsel asserted that this was not Delage's usual means of comparing prints. He stated that Delage testified at another trial weeks earlier that she did not compare individual points:

> And one of the questions that she was asked and answered [in the earlier trial] that she doesn't actually count the number of points that are in each particular comparison, and what she made in this particular blowup and example, she does, in fact, count all of the points and label them on a computer-generated composite exhibit,

9

essentially that she also previously testified she's never made before.

(*Id.*, p. 8.)

The state trial court found no discovery violation (*Id.*, pp. 12-13.) At trial, Delage testified on direct examination that she "look[ed] for specific features that we call identifying features or minutia" to make an identification. (Doc. 6-2, Ex. 7, pp. 344-45.) A State exhibit showed enlarged images of the latent print from the scene and Armstrong's known print side-by-side. (*Id.*, p. 340.) Delage explained that blue lines on the image of the latent print showed where she "performed an analysis and comparison" and "noted all of the points of identification in this particular print." (*Id.*, p. 341.) She testified that "[a]ll of these points of identity are in the exact same position in each print." (*Id.*, pp. 348-49.) She matched 17 points of comparison, which gave her "enough to determine it was a positive identification to Mr. Armstrong." (*Id.*, p. 349.)

When counsel cross-examined Delage, he elicited her testimony that using this technique, including counting individual points, was outside her normal practice. She agreed that "counting the number of places of identification" was not a typical part of her comparison and that she "would normally look at the totality of the fingerprint." (*Id.*, pp. 356-57.) Counsel elicited Delage's testimony that these prints could have contained

10

approximately 1,000 points of identity, and that she "decide[d] what points of comparison exist in that latent print" in her analysis. (*Id.*, pp. 357-38.)

Delage also testified on cross-examination that she first compared the prints on April 24, 2012, shortly after the burglary. (*Id.*, pp. 360-61.) But Delage acknowledged that she did not compare the individual points on the prints, as illustrated in the State's exhibits, until the week before the trial. (*Id.*, p. 356.)

In his closing argument, counsel addressed Delage's use of a different comparison method in this case, asserting that "she never does this, never counts these things." (*Id.*, p. 419.) He also highlighted her testimony that she did not perform "this particular analysis" until it was "absolutely necessary a week ago," after Armstrong had been found in possession of the property. (*Id.*, pp. 419, 422.) Counsel emphasized Delage's testimony that her analysis utilized 17 out of approximately 1,000 points of comparison. (*Id.*, pp. 419, 422.) Counsel argued that the State had not met its burden to show that Armstrong was the perpetrator, arguing that "17 out of a thousand doesn't get us there, especially when we're talking about comparisons that are done after . . . it's known that Mr. Armstrong is in possession of this property." (*Id.*, p. 426.)

### 2. Postconviction Proceedings

The state court held an evidentiary hearing on Armstrong's claim that counsel was ineffective for failing to hire an expert witness. Armstrong

testified that counsel was "mindful" of retaining a fingerprint expert, "but it . . . just never happened." (Doc. 6-2, Ex. 22, pp. 12, 17.)

Counsel testified that he never told Armstrong that he would hire an expert, nor did he ever contemplate doing so. (*Id.*, pp. 23-24.) He stated that he deposed Delage and extensively researched fingerprint testing techniques. (*Id.*, pp. 20-21.) Counsel testified that he combined his research with information Delage provided at deposition to "put together a cross-examination that would have effectively taken care of all the issues that . . . an independent fingerprint expert would have looked at and addressed." (*Id.*, p. 21.)

Counsel also explained that he had represented Armstrong during two earlier trials that ended in acquittal. (*Id.*, pp. 19-20.) Delage was the fingerprint expert in both trials. (*Id.*) Counsel theorized that, in the light of Armstrong's earlier acquittals, Delage "essentially redid everything that she had done on th[is] case" by comparing the prints' individual points of identification shortly before trial. (*Id.*, pp. 21-23.)

Counsel did not believe that retaining an expert would have made any difference at trial. (*Id.*, p. 26.) He testified that any expert he hired would have the same certifications as Delage, and he did not want to "hire somebody to do the exact same" fingerprint analysis. (*Id.*, p. 24.) Indeed, counsel was unsure that "a fingerprint expert would have found that it was not" Armstrong's print,

because "AFIS came back with a hit and Ms. Delage just confirmed it." (*Id.*, pp. 25-26.)

The state court found counsel's testimony more credible than Armstrong's testimony. (Doc. 6-2, Ex. 23, p. 6.) Based on this testimony, the state court found that counsel did not tell Armstrong that he would hire a fingerprint expert. (*Id.*) The state court also found that counsel made a reasonable strategic decision to attack Delage's comparison method rather than to hire an expert. (*Id.*) The state court concluded that Armstrong failed to meet either prong of *Strickland*. (*Id.*)

### 3. Analysis of the State Court's Ruling

The state court's ruling was reasonable. The state court's findings that counsel was credible and that counsel made a strategic decision are findings of fact that are presumed to be correct. *See Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." (citation omitted); *Whatley v. Warden, Ga. Diagnostic and Classification Ctr.*, 927 F.3d 1150, 1177 (11th Cir. 2019) (stating that "credibility-based determinations are findings of fact" that are presumed correct). Armstrong does not rebut, by clear and convincing evidence, the presumption of correctness afforded to these factual findings. 28 U.S.C. § 2254(e)(1).

13

The testimony that the state court found credible shows that counsel did not tell Armstrong that he would hire an expert. This testimony also supports the state court's conclusion that counsel's strategic decision was reasonable. Counsel researched fingerprint evidence techniques and was familiar with Delage's earlier testimony. Counsel did not believe that an expert would have come to a different conclusion after comparing the prints. Rather than have an expert repeat the comparison when he had no reason to expect a more favorable outcome, counsel reasonably decided to challenge Delage's comparison. As detailed above, counsel elicited Delange's testimony about the comparison she performed in this case and incorporated it into his closing argument.

Furthermore, Armstrong has not come forward with evidence that another fingerprint analyst would have testified that the latent print was not a match to Armstrong's prints. Without such information, Armstrong's claim is too speculative to warrant federal habeas relief. *See Shaw v. United States*, 729 F. App'x 757, 759 (11th Cir. 2018) ("[The Eleventh Circuit has] stated that complaints about uncalled witnesses are not favored, because the presentation of testimony involves trial strategy and 'allegations of what a witness would have testified are largely speculative.' " (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978))); *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009) ("In a habeas petition alleging ineffective assistance of counsel, mere speculation that missing witnesses would have been helpful is

14

insufficient to meet the petitioner's burden of proof." (citing *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001))).

Armstrong has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground One.

**B. Ground Two**

Armstrong argues that trial counsel was ineffective for failing to obtain evidence to impeach Delage in the light of her testimony that she did not use her normal comparison techniques in this case. Armstrong contends that impeachment evidence would have cast doubt on Delage's trial testimony, and that the outcome of the trial likely would have been different because the latent print was the State's key evidence.

The state court denied Armstrong's claim without an evidentiary hearing. The state court noted that Delage admitted on cross-examination that using individual points of comparison was not her normal course of action. (Doc. 6-2, Ex. 19, p. 5.) The state court reasoned that because Delage conceded that she did not normally use the comparison methodology that she employed in Armstrong's case, "there was no impeachable issue regarding Ms. Delage's methodology." (*Id.*) Accordingly, the state court concluded that Armstrong had not established either prong of *Strickland*. (*Id.*, p. 6.)

The state court's ruling was reasonable. As addressed above, counsel ensured that the jury was aware of Delage's unorthodox practice in this case through his cross-examination and arguments. Moreover, Armstrong has not identified any other impeachment evidence that counsel could have obtained. Nor has he shown a reasonable probability that any such evidence would have changed the trial's outcome in the light of Delage's acknowledgment that she used a different method in this case. Armstrong's speculative argument fails to establish that counsel was ineffective. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim).

Because Armstrong has not shown that the state court's ruling involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination, he is not entitled to relief on Ground Two.

## V.   <u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

16

Armstrong has not made the requisite showing. Finally, because Armstrong is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Armstrong's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Armstrong and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on May 29, 2026.

Kathryn Kimball Mizelle
United States District Judge